UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MELALEUCA, INC., | |
| Plaintiff, | Case No. CV 07-212-E-EJL-MHW |
| v. | **REPORT AND RECOMMENDATION** |
| DARYL HANSEN, | |
| Defendant. | |

## INTRODUCTION

Pending before the Court is Defendant Daryl Hansen's Motion to Dismiss (Docket No. 38).[1] This action was filed on May 8, 2007 and the pending Motion was filed on October 24, 2008. The action has been stayed since February 13, 2009 upon the parties' representations that they were involved in settlement negotiations. On June 3, 2010, the parties informed the Court that no settlement had been reached and the case would be proceeding forward. Accordingly, the Court will now render its decision on the pending Motion.

---

[1] This motion was previously dismissed without prejudice while the parties were engaging in settlement discussions. At the status conference held on June 3, 2010, the parties indicated that settlement negotiations had broken down and that the motion was being renewed.

**REPORT & RECOMMENDATION - 1**

## REPORT

## BACKGROUND

Defendant Hansen resides in California and at the time of these alleged events, worked as an independent marketing executive for a multi-level marketing company called ITV. In connection with the work he performed for ITV, Hansen would attempt to get ITV customers to join ITV, performing the same type of work. Melaleuca, an Idaho corporation, is engaged in a similar type of business model. Melaleuca encourages its customers to become marketing executives by referring family and friends to Melaleuca to purchase its products and allowing them to earn commission on any orders made by the referred individuals.

Additionally, Melaleuca is the owner of the domain name iglide.net. Through iglide.net, Melaleuca gives their marketing executives the option of purchasing Internet services, including e-mail. Melaleuca provides e-mail accounts through the iglide.net domain name and provides Internet access through a third-party Internet Service Provider ("ISP"), IP Applications. (Nye Aff., Docket No. 43-3, ¶¶ 4-5.)

After Hansen began working at ITV, he contacted individuals via e-mail, some of whom worked at Melaleuca, and inquired whether they would be interested in hearing about a new business opportunity. The e-mails gave a brief description of how ITV works, exulted the benefits of working for ITV and asked the individuals to call him. It has been represented at an earlier hearing that Hansen was aware that several of these individuals

worked at Melaleuca. Some of the Melaleuca marketing executives he contacted were users of the iglide.net e-mail service.

Melaleuca has brought four causes of action against Hansen, including violation of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM" Act), 15 U.S.C. § 7701, *et seq.*, violation of the Idaho Consumer Protection Act ("ICPA"), misappropriation of trade secrets and tortious interference with contract.

## DISCUSSION

**1.     Standard of Review**

A motion to dismiss under Rule 12(b)(6) will be granted when the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Generally, the Court may not consider any material beyond the pleadings in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Branch v. Tunnel*, 14 F.3d 449, 453 (9th Cir. 1993). Furthermore, if a Rule 12(b)(6) motion raises "matters outside the pleading" and these matters are "presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Id.* at 453. When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of

some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those which may affect the outcome of the case. *See id*. at 248.

**2. Defendant's Motion**

Hansen has moved to dismiss Melaleuca's CAN-SPAM claim on the grounds that Melaleuca does not have standing to bring such a claim. He also seeks to have count two, violation of the Idaho Consumer Protection Act, dismissed because it is preempted by federal law.

**A.** *Standing under the CAN-SPAM Act*

There are two elements for standing under the CAN-SPAM Act: (1) Plaintiff must be a provider of "Internet access service" and (2) Plaintiff must be "adversely affected" by a violation of the Act. 15 U.S.C. § 7706(g)(1). Hansen argues that Melaleuca fails on both elements.

(1) *Internet Access Service*

The CAN-SPAM Act defines the term "Internet access service" by reference to the Communications Act, *see* 15 U.S.C. § 7702(11), which, in turn, defines Internet access service ("IAS") as a service that "enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to

consumers." 47 U.S.C. § 231(e)(4).

Prior to 2009, districts courts in the Ninth Circuit broadly interpreted the term "Internet access service." *See Hypertouch, Inc. v. Kennedy-Western Univ.*, 2006 WL 648688 (N.D. Cal. March 8, 2006); *MySpace, Inc. v. The Globe.com, Inc.*, 2007 WL 1686966 (C.D. Cal. Feb. 27, 2007). In 2009, the Ninth Circuit weighed in on the matter and expressly rejected an overly broad interpretation of "Internet access service" that would ignore congressional intent. *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1051 (9th Cir. 2009). The court recognized that Congress intended to "exclude plaintiffs who, despite certain identifying characteristics, did not provide the actual, *bona fide* service of a legitimate operation." *Id*. at 1050 (emphasis in original). While recognizing that standing would not be limited to traditional Internet service providers ("ISPs"), the service that connects customers to the Internet itself, the Ninth Circuit held that providing e-mail accounts alone would not be sufficient. *Id*. Without setting forth a general test or defining the outer bounds of what it means to be an "Internet access service" provider, the court noted that there "may be a technical or hardware component implicit in the definition." *Id*. at 1052. In *Gordon*, the court held that the plaintiff was not a provider of "Internet access service" because it hosted its registered domain name on leased server space, did not have access or physical control over the hardware, and a third party enabled his online access. *Id*.

Like the plaintiff in *Gordon v. Virtumundo*, Melaleuca provides e-mail accounts to

REPORT & RECOMMENDATION - 5

its customers through the iglide.net domain name which it owns. Melaleuca also, like the plaintiff in *Gordon*, provides Internet access through a third party ISP called IP Applications. Melaleuca does not have access or control over the hardware that enables Internet access. Because Melaleuca does not have more than a "nominal role in providing Internet-related services," it does not fall within the definition of an "Internet access service" provider. *See Gordon v. Virtumundo*, 575 F.3d at 1052. Accordingly, Melaleuca lacks standing to bring a claim under the CAN-SPAM Act.

      (1) *Adversely Affected*

Even if Melaleuca was found to be an IAS provider, it would also have to satisfy the "adversely affected" element in order to have standing under the CAN-SPAM Act. In *Gordon*, the Ninth Circuit addressed what type of harm would satisfy the "adversely affected" element in order to confer standing. The court found that the "harms redressable under the CAN-SPAM Act must parallel the limited private right of action and therefore should reflect those types of harms uniquely encountered by IAS providers," not merely consumers and end users. 575 F.2d at 1053. Examples of the type of harm Congress wanted to protect against, that were identified in the Committee Report, included investment in new equipment for increased capacity, customer service personnel to deal with increased complaints, and other anti-spam technology to reduce deluge of spam. *Id.* (citing S. Rep. No. 108-102, at 6). Courts have similarly found the harms such as "network crashes, higher bandwidth utilization, and increased costs for hardware and software

**REPORT & RECOMMENDATION - 6**

upgrades, network expansion, and additional personnel" were among the types of harms envisioned by Congress. *Id.* (citing *ASIS Internet Services v. Active Response Group*, 2008 WL 2952809, *5 (N.D. Cal. July 30, 2008)). While the Ninth Circuit would not enumerate each and every harm that might satisfy this element, it did note that the harm must be real and the kind "experienced by ISPs." *Id*. That is, it must be of "significance to a *bona fide* IAS provider, . . . greater than the negligible burdens typically borne by an IAS provider in the ordinary course of business." *Id*. at 1054. Further, the court dictated that an especially hard look should be taken if a court suspects that the plaintiff is not a *bona fide* Internet access provider. *Id*.

As for the harm it experienced, Melaleuca argues as spam increases, it loses customers, customer complaints increase and that it received at least six complaints directly related to the e-mails sent by Hansen. Melaleuca also contends that spam increases its cost of providing e-mail services due to increased personnel costs and increased costs for storage. Melaleuca's ISP, IP Applications, bills Melaleuca for storage and support calls in excess of prescribed amounts and accordingly Melaleuca pays a higher price for IP Application's Internet services.  (Nye Aff. ¶¶ 9-12; Carter Aff., Docket No. 43-5, ¶ 10.)

The harm described by Melaleuca is not the type that Congress envisioned when it enacted the CAN-SPAM Act. Melaleuca does not complain of requiring hardware upgrades or higher bandwidth due to spam. The types of harms described by Melaleuca, namely increased cost of IP Applications' Internet services, fall into the category of

"consumer and end user" harms described by the Ninth Circuit in *Gordon v. Virtumundo*. *See* 575 F.3d at 1053. These harms were not envisioned by Congress when it limited the private right of action to adversely affect IAS providers. They are not the type experienced by ISPs or of significance to a *bona fide* IAS provider. Melaleuca fails to satisfy both elements for standing set forth in the CAN-SPAM Act.[2]

### B. State Law Claims

Based on the Court's finding that Plaintiff's federal CAN-SPAM Act claim should be dismissed, it is prudent to consider whether the Court should continue to exercise jurisdiction over the remaining state law claims. *Acri v. Varian Associates*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc). Where, as here, the Court has determined prior to trial that all federal claims shall be dismissed, "the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)). Thus, in accordance with the direction provided by the case law, and consistent with the factors set forth in 28

---

[2] In an apparent effort to bolster its standing argument, on November 26, 2008, five days before filing its response brief, Melaleuca received an assignment of claims from IP Applications for all CAN-SPAM and other claims related to unsolicited commercial e-mail sent to e-mail accounts sold by Melaleuca. Pl's Mem., Ex. A, Docket No. 43-2. Without deciding whether IP Applications would have standing under the CAN-SPAM Act, the Court finds this assignment does not establish Melaleuca's standing to bring a CAN-SPAM action against Hansen. Standing is determined at the time an action is commenced. *See Minneapolis & St. L. R.R. Co. v. Peoria & Pekin Union Ry. Co.*, 270 U.S. 580, 586 (1926); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n. 4 (1992). Because this assignment occurred more than a year after this action was filed, it does not cure the defects the Court has found with Melaleuca's standing to bring a claim under the CAN-SPAM Act. *See also Blair-Naughton, LLC v. Diner Concepts, Inc.*, 2007 WL 4463584, *2 (D. Kan. Dec. 17, 2007) (finding that party had no standing because the purported assignment occurred after the case had been filed and two days prior to the party filing their response to a motion to dismiss).

U.S.C. § 1367(c), the Court declines to exercise its discretion to hear the state law claims and will dismiss the claims without prejudice to the Plaintiffs' right to refile them in state court. For these reasons, the Court will not address the CAN-SPAM preemption argument which can be raised in state court.

## RECOMMENDATION

IT IS RECOMMENDED that Plaintiff's Motion to Dismiss (Docket No. 38) **be GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1, or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.



DATED: June 29, 2010

Honorable Mikel H. Williams
United States Magistrate Judge